UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| W.R. COBB COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) C.A. No. 1:18-CV-00551-MSM-LDA ) |
| VJ DESIGNS, LLC d/b/a GALILI & CO., and BENJAMIN GALILI, | ) ) ) ) |
| Defendants. | ) ) ) |

DECISION AND ORDER

Mary S. McElroy, United States District Judge.

The plaintiff, W.R. Cobb Company ("W.R. Cobb"), brought suit over a failed business arrangement with the defendants, VJ Designs, LLC d/b/a Galili & Co. ("VJ Designs") and Benjamin Galili, alleging breach of contract, fraudulent misrepresentation, and negligent misrepresentation. The defendants have asserted a counterclaim against W.R. Cobb for breach of contract.

The parties conducted a jury-waived trial before the Court from May 23 to May 24, 2023. Having considered the evidence presented at trial and the post-trial memoranda submitted by the parties, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## I. FINDINGS OF FACT

The plaintiff, W.R. Cobb, is a medium-sized jewelry manufacturer headquartered in East Providence, Rhode Island. Its president and CEO is Roderick Lichtenfels. The defendant, VJ Designs, is a Delaware corporation, founded by its

1

CEO, Benjamin Galili.

VJ Designs held a Forevermark manufacturing license which allowed it to manufacture and sell Forevermark-branded jewelry at a premium price. Tr. I at 32; Ex. B-2 § 2.3. A Forevermark manufacturing license is a valuable asset to a manufacturer of diamond jewelry. Tr. I at 202; Tr. II at 40. At the time that VJ Designs received its Forevermark license in 2011-2012, only 20 such licenses existed in the United States. Tr. II at 40. The evidence demonstrates that at all relevant times, VJ Designs had a valid Forevermark license. Specifically, Mr. Galili attended a Forevermark function at the June 2018 Las Vegas jewelry show as a Forevermark license holder and received correspondence in June and November 2018 from Forevermark addressed to Forevermark license holders regarding future projects and events. Tr. II at 43; Exs. V, W.

W.R. Cobb was interested in partnering with VJ Designs because of the Forevermark license. Tr. I at 24. Beginning in 2016, Mr. Lichtenfels attempted to procure by purchase or other means the Forevermark license held by VJ Designs. Exs. A, AA.

On May 30, 2018, W.R. Cobb and VJ Designs entered into an Agreement which created a joint venture among W.R. Cobb, VJ Designs, and Galili, called WR Cobb/VJ LLC ("Joint Venture"). Ex. 5. The Agreement was initially and largely drafted by W.R. Cobb, but counsel for the defendants reviewed the document and provided substantive edits that were incorporated into the final draft. Ex. 3; Tr. I at 205-06.

The Agreement provided that VJ Designs would have a 51% interest in the newly formed Joint Venture and that Wenham Enterprises, LLC, an affiliate of W.R. Cobb, would have the remaining 49% interest. Ex. 5. The parties set up the ownership of the Joint Venture with VJ Designs being majority owner so that Forevermark would consent to the assignment of the Forevermark license to the Joint Venture. Tr. I at 86-87. Under the Agreement, VJ Designs' 51% interest would be assigned to Wenham Enterprises "for no cost after Forevermark becomes comfortable" with W.R. Cobb. Ex. 5 § 1(iii). VJ Designs did execute the undated assignment of its 51% ownership to Wenham Enterprises at the time of the Agreement's closing. Ex. 7.

The preamble to the Agreement stated that "This letter agreement outlines the revised offer by W.R. Cobb Company ('WRC') or its assignee to operate a Forevermark business under the Forevermark license and acquire certain assets from [VJ Designs]." Ex. 5. Section 1 of the Agreement described the Joint Venture's purpose: to "operate a Forevermark business under the Forevermark license with other assets related to the Forevermark business that WRC and its affiliate are purchasing from VJ pursuant to the terms and conditions of this [Agreement]." *Id.*

Prior to the signing of the Agreement, W.R. Cobb conducted due diligence and was aware that VJ Designs' Forevermark license was not transferrable without the express written approval of Forevermark. Tr. I at 172, 174-76; Ex. 4. Indeed, the Forevermark contractual materials that VJ Designs provided to W.R. Cobb plainly stated the same. Ex. B-2 §§ 2.3, 4.7. Accordingly, the Court finds as credible Mr.

3

Galili's testimony that he never represented to W.R. Cobb that VJ Designs could transfer its Forevermark license without the written consent of Forevermark. Tr. I at 210.

Mr. Lichtenfels testified that there was a document from Forevermark granting written permission to VJ Designs to transfer its license to the Joint Venture at or about the time of the Agreement's closing. *Id.* at 71-72. The Court finds this testimony incredible, particularly given the fact that no such document was produced. Similarly, Mr. Lichtenfels testified that there was a separate document from the Agreement requiring VJ Designs to transfer the Forevermark license to the Joint Venture. *Id.* at 81. This, too, is incredible as no document was ever produced and there is no reference to it in the Agreement.

Mr. Lichtenfels testified that sometime prior to May 30, 2018 (the date the parties executed the Agreement) a W.R. Cobb employee, Sam Offir, met with Forevermark representatives who told him that Forevermark would allow the transfer of VJ Designs' Forevermark license to the Joint Venture if VJ Designs owned a majority interest in the Joint Venture, though under no specific timeframe. *Id.* at 58-59. The Court does not find this testimony credible, particularly given that Mr. Offir, an employee of W.R. Cobb at the time of trial, was not called to testify.

Mr. Lichtenfels drafted an email for Mr. Galili to send to Forevermark representatives, which was further revised by Mr. Galili's counsel, and sent on May 18, 2018. Tr. 61-62; Exs. 2, 3. The email stated that "[y]our approval of the possible Joint venture is greatly appreciated as it significantly enhances our abilities to

4

continue growing the Forevermark business in the coming years." Ex. 2. Further, the email stated, "[i]f and when the JV Agreement is signed and concluded to our satisfaction, then the new entity … holding the Forevermark Jewelry Manufacturing license going forward will be owned 51% by VJ Designs, DBA Galili & Co. and 49% by W.R. Cobb." *Id.* The Court finds that Forevermark never responded to this email. Mr. Lichtenfels testified otherwise, but no such document was presented in evidence. Tr. I at 73, 76-77.

At the time of the closing, W.R. Cobb paid to VJ Designs $125,000 for the license and assets identified in § 1(iv) of the Agreement. Ex. 5. The listed assets included jewelry models and molds. *Id.* W.R. Cobb's Vice President of Finance, Jonathan Loiselle, signed a receipt for these items on July 2, 2018. Tr. I at 113; Ex. 10. Customer lists were also an asset included in § 1(iv). Mr. Lichtenfels testified that W.R. Cobb never received these from VJ Designs but on cross-examination conceded that he had received them but that he "suspect[ed]" that they were incomplete as far as he could remember. Tr. I at 148-49.

Another VJ Designs asset listed in §1 (iv) were computer aided drawing ("CAD") files. CADs are an important tool in jewelry manufacturing. *Id.* at 39. Mr. Galili testified, credibly, that he believed at the time of the entering the Agreement that he owned the CADs that were used in his Forevermark business. Tr. II at 64-65. He based this belief on the fact that he paid $200 per CAD to the third-party company that generated them. *Id.* at 66. He therefore represented to W.R. Cobb that he was able to transfer these at the time of the Agreement but, in fact, he was unable

5

to do so. The record indicates that Mr. Galili was working to resolve this issue as the topic of CADs resurfaced in a July 12, 2018, email from Mr. Galili to Mr. Lichtenfels where Mr. Galili wrote, "[w]hatever CAD files are available, VJ will be happy to provide once it is received from the company(s) that did the work for VJ." Ex. 12.

VJ Designs' also received from W.R. Cobb at the Agreement's closing an advance of $150,000 towards its Forevermark inventory. Section 1(vi)(1) of the Agreement required that W.R. Cobb provide "Purchase Orders" for the inventory. W.R. Cobb never provided these and so the defendants never handed over the inventory. On August 2, 2018, Mr. Galili sent an email to Sam Offir of W.R. Cobb requesting that it select $150,000 worth of Forevermark inventory by forwarding a purchase order. Ex. CC. Mr. Galili reiterated this in an August 12, 2018, email. Ex. S.

The Agreement, § 1(iv), also allowed W.R. Cobb to obtain the rights and obligations to VJ Designs' lease for its office space in New York City. Ex. 5. The landlord, however, did not agree to the transfer of the lease from VJ Designs to W.R. Cobb's affiliate, WRC Consulting, LLC. Tr. I at 43; Exs. P, Q. But VJ Designs' lease expired at the end of June 2018 and the landlord allowed a lease agreement with WRC Consulting beginning July 1. Ex. 11. Mr. Lichtenfels testified that Mr. Galili never provided the keys for the leased premises, but Mr. Loiselle's testimony indicates that W.R. Cobb did gain physical possession of the premises at a later date that he could not specify. Tr. I at 116; Tr. II at 111.

W.R. Cobb incurred a total of $86,506.89 in expenses to attend the 2018 Las

Vegas jewelry show. Mr. Lichtenfels, however, testified that W.R. Cobb was not claiming the entire costs as damages from the defendants, but was unspecific about what he attributed to them. Tr. I at 188. It is noteworthy that these costs were largely incurred before the parties executed the Agreement and that W.R. Cobb would have attended the show, though perhaps in a different capacity, had it never entered into the Joint Venture with VJ Designs. *Id.* at 188-89.

On July 17, 2018, W.R. Cobb wired VJ Designs $15,000 as an advance on its share of the Joint Venture's first month's anticipated profits. Tr. I at 49; Ex. 19.

Section 3 of the Agreement required Mr. Galili to provide management services to the Joint Venture, but this management agreement could be cancelled by either party with 60 days' written notice. Ex. 5. On August 8, 2018, Mr. Galili provided W.R. Cobb with 60 days' notice that he was resigning from the management agreement. Ex. 14. The Court finds that Mr. Galili, through his letter and his testimony, intended only to withdraw from management but not from the Joint Venture. Ex. 14; Tr. II at 92. W.R. Cobb, however, took this withdrawal from management to be an "exit" from the Joint Venture. Tr. I at 153, 156, 160-61. W.R. Cobb ultimately abandoned the Joint Venture and filed the instant lawsuit on October 3, 2018.

## II.  CONCLUSIONS OF LAW

As this matter is before the Court subject to diversity jurisdiction, 28 U.S.C. § 1332, the Court applies state substantive law. *Crellin Techs, Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 4 (1st Cir. 1994).

7

A. **W.R. Cobb's Claims**

1. **Breach of Contract**

Under Rhode Island law, a breach-of-contract claim requires the plaintiff to "prove both the existence and breach of a contract, and that the defendant's breach thereof cause the plaintiff's damages." *Fogarty v. Palumbo*, 163 A.3d 526, 541 (R.I. 2017). Neither party disputes that the May 30, 2018, Letter of Agreement was a contract. Further, neither party directly argues that the Agreement is ambiguous, and the Court finds that it is not. W.R. Cobb has raised several areas where it alleges that the defendants breached the Agreement, and the Court will consider each in turn.

a. **Transfer of the Forevermark License**

W.R. Cobb's claim of breach of contract is primarily focused on the assertion that, in violation of the Agreement, the defendants failed to transfer the Forevermark license held by VJ Designs to the Joint Venture. It is W.R. Cobb's contention that the Agreement required the transfer of the license at the time of the execution of the Agreement. The defendants, however, argue that the license was to remain with VJ Designs while it was the majority owner of the Joint Venture, but that VJ Designs' majority interest would be transferred to W.R. Cobb's subsidiary after a waiting period for Forevermark to become comfortable with W.R. Cobb and consent to such a transfer.

The Court turns to the language of the Agreement to find the answer. *See* Ex. 5. First, the preamble paragraph, as well as § 1 of the Agreement, indicate that the

8

Forevermark license and VJ Designs' other assets are intended as two separate categories in the acquisition.

> The preamble:
>
> This letter agreement outlines the revised offer by [W.R. Cobb] … to operate a Forevermark business under the Forevermark license *and* acquire certain assets from [VJ Designs]. (Emphasis added.)
>
> Section 1:
>
> WRC formed a new Delaware LLC named WR Cobb/VJ LLC ("Cobb/VJ["]). Upon execution and delivery of this Agreement, and in consideration of the payments of amounts by WRC and its affiliates to VJ as set forth below, Cobb/VJ shall operate a Forevermark business under the Forevermark license *with other assets* related to the Forevermark business that WRC and its affiliate are purchasing from VJ pursuant to the terms and conditions of this letter agreement. (Emphasis added.)

Importantly, there is no provision within the Agreement specifically requiring that the Forevermark license immediately be transferred to the Joint Venture. But there is § 1(iv) which provided for payment of the license with other purchased assets and VJ Designs does not dispute that those other assets were due at or about the time of the Agreement's closing:

> Simultaneously with the execution of this letter agreement, WRC or its affiliate(s) will pay VJ the nonrefundable amount of $125,000 for the license, models and molds, CAD's, office furnishing and equipment, computers and software, customer information and rights and obligations to VJ's lease for its office space…..

However, when viewed with the remainder of the Agreement, specifically § 1(iii), the plaintiff was to "assume ownership of VJ's 51% interest in Cobb/VJ for no cost *after Forevermark becomes comfortable with WRC*." (Emphasis added.) If the license was to be transferred at the execution of the Agreement, there would be no

9

need for a waiting period for Forevermark to become "comfortable" with W.R. Cobb.

Further, there is § 1(vi)(3), which allows VJ Designs to sell its Forevermark "inventory to non-retail customers providing the sales do not compete with" the Joint Venture. Only a party holding a Forevermark license can sell Forevermark inventory, so this provision would make little sense if VJ Designs no longer had its license. So too would § 1(vi)(1), which allowed the Joint Venture to purchase Forevermark inventory from VJ Designs using purchase orders.

Accordingly, viewing the Agreement in its totality makes clear that VJ Designs was not required transfer its Forevermark license upon execution of the Agreement. Instead, it was to maintain its license as majority owner of the Joint Venture and, when Forevermark became "comfortable," with W.R. Cobb, the assignment of VJ Design's interest in the Joint Venture would be utilized. W.R. Cobb's claim for breach of contract for failure to transfer the license therefore fails.

### b. VJ Designs' Forevermark Inventory

W.R. Cobb alleges that the defendants breached the Agreement by failing to provide Forevermark inventory. Pursuant to § 1(vi) of the Agreement, W.R. Cobb paid VJ Designs a $150,000 advance for Forevermark diamonds in the VJ Designs' inventory. The Agreement is clear that this purchase of inventory required "Purchase Orders." Ex. 5 at § 1(vi)(1).

VJ Designs made numerous attempts to have the W.R. Cobb provide the purchase orders necessary for VJ Designs to turn over the Forevermark inventory. On August 2, 2018, Mr. Galili sent an email to Sam Offir of W.R. Cobb requesting

10

that it select $150,000 worth of Forevermark inventory by forwarding a purchase order. Ex. CC. This was reiterated by Mr. Galili through an email dated August 12, 2018. Ex. S.

Because W.R. Cobb did not provide purchase orders for the inventory, as required by the Agreement, the Court concludes that the defendants did not breach the contract by failing to hand over the inventory.

### c. Other Assets

W.R. Cobb also asserts that the defendants breached § 1(iv) of the Agreement which included the transfer of certain of VJ Designs' assets to the Joint Venture. These included models and molds, CADs, and customer information.

As far as the models and molds, W.R. Cobb cannot sustain its burden to prove its allegation that the defendants failed to provide these items. Jonathan Loiselle, W.R. Cobb's Vice President of Finance, signed a receipt for these items. Tr. II at 113; Ex. 10.

W.R. Cobb also claims that VJ Designs failed to turn over costumer lists, though Mr. Lichtenfels' testimony on this topic altered on cross-examination to a claim that he did receive costumer lists but he "suspect[ed]" they were incomplete as far as he could remember. Tr. I at 39, 48, 148-49. The Court finds the evidence here inconclusive and insufficient to satisfy W.R. Cobb's burden.

Section 1(iv) also required the transfer of the CADs in VJ Designs' possession at the time of the execution of the Agreement. Mr. Galili mistakenly stated that he owned the CADs prior to the execution of the Agreement but later found out that a

third-party vendor retained ownership of the CADs. Nevertheless, the defendants are in breach of the Agreement which unambiguously required transfer of the CADs.

W.R. Cobb argues that the failure to transfer the CADs was a material breach warranting recission of the Agreement. A material breach is one that "substantially defeats" the contract's purpose or that "it is shown that the parties considered the breach as vital to the existence of the contract." *Women's Dev. Corp. v. City of Cent. Falls*, 764 A.2d 151, 158 (R.I. 2001). "Determining the legal threshold for 'materiality' is 'necessarily imprecise and flexible.'" *Id.* (quoting Restatement (Second) Contracts § 241 cmt. a at 237 (1981)).

While there is no doubt the CADs were important to the functioning of the Joint Venture, the evidence also indicates that approximately six weeks after the establishment of the Joint Venture, Mr. Galili was attempting to rectify the issue and provide the CADs. *See* Ex. 12 ("Whatever CAD files are available, VJ will be happy to provide once it is received from the company(s) that did the work for VJ."). A factor to consider when determining whether a breach is material is "the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances." *Women's Dev. Corp.*, 764 A.2d at 158. Here, the Court finds that despite his mistaken belief as to ownership of the CADs, Mr. Galili was attempting to cure the breach and likely would have obtained and transferred the CADs, which he had paid for, had the Joint Venture continued. As such, the Court concludes that failure to transfer the CADs was not a material breach.

But it was a breach, nonetheless. W.R. Cobb can prevail on its breach of contract claim if it can prove damages caused by the breach. Rhode Island law requires that "the amount of damages sustained from a breach of contract … be proven with a reasonable degree of certainty. The plaintiff must establish reasonably precise figures and cannot rely upon speculation." *Sea Fare's Am. Café, Inc. v. Brick Mkt. Place Assocs.*, 787 A.2d 472, 478 (R.I. 2001) (internal citation omitted). "However, '[p]laintiffs will not be denied recovery merely because the damages … are difficult to ascertain, as long as they prove damages with reasonable certainty.'" *Id.*

There is no evidence that would allow the Court to award a measure of damages for the defendants' breach involving the CADs without engaging in speculation. For instance, it is unclear what W.R. Cobb even had paid for them. The $125,000 that W.R. Cobb paid in relation to the CADs was also meant to cover numerous assets of presumably varying values: models and molds, office furnishings and equipment, computers and software, customer information, the rights and obligations to VJ Designs' lease for its office space, as well as the most important asset, the Forevermark license. Ex. 5 at § 1(iv). Because W.R. Cobb has not proven any damages regarding the defendants' failure to provide the CADs with any reasonable certainty, it cannot prevail on its breach of contract claim on that issue. *See Sea Fare's Am. Café, Inc.*, 787 A.3d at 478.

### d. Lease for New York City Office Space

Also in § 1 (iv) of the Agreement, W.R. Cobb was to obtain the rights and obligations of VJ Design's lease for its New York City office space. Specifically, per §

1(v), the parties were to "work together to get the landlord to approve the assignment by VJ to WRC Consulting, LLC, a WRC affiliate." Then, "[e]ffective June 1, 2018, WRC Consulting shall be responsible for the payment of rent and all other expenses and obligations relating to the Office…."

As it turned out, the landlord did not agree to transfer the lease to WRC Consulting and required that VJ Design's lease expire at the end of June 2018 before then leasing it to WRC Consulting. Tr. I at 43; Exs. P, Q. Therefore, WRC Consulting entered into a lease agreement with the landlord beginning July 1, 2018, at which time it had authority to enter the premises. Ex. 11. W.R. Cobb, through the testimony of Mr. Lichtenfels, has maintained that Mr. Galili never provided the keys for the premises. Tr. I at 116. The Court concludes that the evidence here is insufficient to establish a breach. Mr. Lichtenfels testimony is belied by the testimony of Mr. Loiselle, who indicated that W.R. Cobb did gain physical possession of the premises but could not recall an exact date. Tr. II at 111. As such, the Court concludes that there is insufficient evidence for W.R. Cobb to sustain its burden with respect to breach of the Agreement on the issue of the office lease.

### e. Costs for the Las Vegas Jewelry Show

W.R. Cobb also attributes costs relating to the 2018 Las Vegas jewelry show in the amount of $86,506.89 to the defendants' breach. Ex. 21. Because the Court concludes that the defendants did not materially breach the contract, W.R. Cobb is

not entitled to these damages.[1] Even if it were, W.R. Cobb did not meet its burden to recoup these costs. For instance, Mr. Lichtenfels testified that he was not seeking damages for the entire cost and was unspecific about exactly how much constituted the claim. Tr. I at 188. Further, most of these costs were incurred before the parties executed the Agreement and Mr. Lichtenfels acknowledged that W.R. Cobb would have attended the jewelry show, in some fashion, even in the absence of the Agreement with VJ Designs. *Id.* at 188-89.

### 2. Fraudulent Misrepresentation

To establish a claim for fraudulent misrepresentation, "'the plaintiff must prove that the defendant made a false representation intending thereby to induce [the] plaintiff to rely thereon and that the plaintiff justifiably relied thereon to his or her damage.'" *McNulty v. Chip*, 116 A.3d 173, 182 (R.I. 2015) (quoting *Parker v. Byrne*, 996 A.2d 627, 634 (R.I. 2010)). This naturally requires the plaintiff to prove that "the defendant had an intention to deceive." *Coccoli v. Town of Scituate Town Council*, 184 A.3d 1113, 1120 (R.I. 2018).

W.R. Cobb contends that Mr. Galili represented that he would assign the Forevermark license to the Joint Venture, and that W.R. Cobb entered into the Agreement on this condition, but that Mr. Galili knew he had no intention of assigning the license. The evidence, however, does not support the assertion that Mr.

---

[1] Similarly, W.R. Cobb also claims as damages the salaries of two employees it paid for work on the Joint Venture. Again, because the Court concludes that the defendants did not materially breach the contract, W.R. Cobb is not entitled to these damages.

15

Galili never intended to assign the license to the Joint Venture. Instead, the evidence supports a conclusion that he intended to assign it once approval from Forevermark was secured—an arrangement supported by the language of the executed version of the Agreement. And W.R. Cobb was well aware of the need for Forevermark approval of any license transfer.

Mr. Galili in fact wrote to Forevermark, prior to execution of the Agreement, advising of his intent for the license to be assigned to the Joint Venture. Ex. 3. Forevermark never responded and, as it turned out, Forevermark's approval of the license transfer never occurred during the life of the Joint Venture. There is no evidence that this resulted from any intentional deception by Mr. Galili.

### 3. Negligent Misrepresentation

To establish a claim of negligent misrepresentation, a plaintiff must establish:

> (1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation.
> *Zarrella v. Minn. Mut. Life Ins. Co.*, 824 A.2d 1249, 1257 (R.I. 2003).

W.R. Cobb asserts that the defendants are liable for misrepresentation because they committed to assign the Forevermark license yet failed to do so, knowing that W.R. Cobb would not enter into the Agreement unless the defendants were required to assign the license. But again, W.R. Cobb was aware that VJ Designs could not assign its license with the written approval of Forevermark and the Agreement acknowledged this situation with its language allowing for time for Forevermark to

16

become "comfortable" with W.R. Cobb before an assignment.  W.R. Cobb ended the business relationship before that ever occurred and, as such, the license transfer never happened.  The evidence simply does demonstrate that the defendants committed any misrepresentation in this process.

W.R. Cobb also claims the defendants misrepresented their ownership of the CADs; that is, that the Mr. Galili inaccurately represented that he owned the CADs and could provide them to W.R. Cobb.  The Court concludes that Mr. Galili did negligently misrepresent that he could give W.R. Cobb the CADs because he should have known that a third-party vendor retained ownership rights of those files.

The record evidence, however, does not establish that this fact was material; that is, that W.R. Cobb would not have agreed to a Joint Venture had it known this fact.  The credible evidence suggests that Mr. Galili was attempting to rectify his failure to provide the CADs when the issue of ownership became known to him.  It is just as likely that W.R. Cobb would have required this process to take place before embarking on a Joint Venture, or insisting on certain assurances in the Agreement for that performance, but still entered the Agreement.  Moreover, the CADs were one item listed for purchase in the Agreement among many and, while the evidence suggests they were important, there is no indication that their transfer in the beginning months of the Joint Venture was so central to its functioning that the misrepresentation warrants recission of the Agreement.

Without a finding of materiality, W.R. Cobb cannot prevail on its claim for misrepresentation.  *See Francis v. Am. Bankers Life Assurance Co. of Fla.*, 861 A.2d

17

1040, 1046 (R.I. 2004).

### B. Defendants' Counterclaim

#### 1. Breach of Contract

The defendants claim that W.R. Cobb breached the Agreement by effectively abandoning the Joint Venture. On August 8, 2018, Mr. Galili sent W.R. Cobb a letter stating that, per § 3 of the Agreement, he was providing the required 60-days' notice that he was resigning from the management of the Joint Venture. Ex. 14. Nothing in that letter, which Mr. Galili confirmed in his testimony, indicated an intent to withdraw from the Joint Venture—just its management. *Id.*; Tr. II at 92. W.R. Cobb considered this Mr. Galili's "exit" from the Joint Venture, rather than only its management. Tr. I at 160-61.

The Court concludes that Mr. Galili's 60-days' notice was consistent with the terms of the Agreement and did not constitute an "exit" from the Joint Venture. W.R. Cobb, by all appearances, thereafter walked away from the Agreement, in breach, and ultimately filed this lawsuit on October 3, 2018.

But fatal to the defendants' breach of contract claim is their inability to prove sufficiently specific damages. *See Sea Fare's Am. Café, Inc.*, 787 A.2d at 478. They claim that they were not able to sell their Forevermark inventory due to W.R. Cobb's failure to submit purchase orders, but there is no specific indication as to what the revenue from these sales, if they occurred, would have been. Moreover, the defendants *did* receive a $150,000 advance on these items from W.R. Cobb, which they never returned. Regarding loss of future sales due to W.R. Cobb's abandonment

18

of the Joint Venture, the defendants point to a document, Exhibit F, that never was admitted into evidence. As such, the defendants' counterclaim for breach of contract fails.

### III.  CONCLUSION

In accordance with the above findings of fact and conclusions of law, the Court directs judgment to enter in favor of the defendants, VJ Designs and Mr. Galili, on the plaintiff, W.R. Cobb's, claims. In addition, judgment shall enter for the plaintiff on the defendants' counterclaim. The parties shall bear their own costs.

IT IS SO ORDERED.

_____
Mary S. McElroy
United States District Judge

March 22, 2024